# ASSET PURCHASE AGREEMENT

THIS AGREEMENT is made on this 18th day of March, 2022, between Trustee in Possession for Soo Hotels, Inc. a Michigan corporation, in bankruptcy Case No. 21-45708-mlo (Bankr. ED Mich) ("Seller") and Dominic Shammami on behalf of an entity to be formed ("Buyer").

## BACKGROUND

A. Seller Soo Hotels, Inc. is engaged in the hospitality business that owns and operates a Comfort Inn franchise ("Business") at 4404 I-75 Business Spur, Sault Ste. Marie, Michigan ("Premises"). Seller St. Marie Hospitality, Inc. owns the real estate that comprises the Premises. Buyer desires to purchase, and Seller desires to sell to Buyer, the Purchased Assets (as defined in Section 1) on the terms and subject to the conditions of this Agreement.

B. Dominic Shammami and Salwan Atto are 50/50 owners of Soo Hotels, Inc. that owns and operates the Comfort Inn at 4404 I-75 Business Spur, Sault Ste. Marie, Michigan.

C. Dia Shammami and Ihsan "Shawn" Atto are 50/50 owners of St. Marie Hospitality, Inc. that owns the real property located at 4404 I-75 Business Spur, Sault Ste. Marie, Michigan.

## AGREEMENTS

NOW, THEREFORE, in consideration of the Background and the terms and conditions set forth in this Agreement, Seller and Buyer agree as follows:

**1. Assets Purchased.** At the Closing, Seller shall sell and deliver to Buyer all of the assets, rights, and interests of every conceivable kind or character whatsoever, whether tangible or intangible, that on the Closing Date are owned by Seller or in which Seller has an interest of any kind ("Purchased Assets"). The Purchased Assets include, without limitation, the following:

**1.1** All equipment (as defined in the Uniform Commercial Code of the State of Michigan, Act No. 174 of Michigan Public Acts of 1962, MCL 440.1101 et seq., as amended ("UCC")), and, to the extent not otherwise constituting equipment as defined above, all other items of tangible personal property, in each case whether or not capitalized on Seller's books (including,

without limitation, the items listed on Schedule 1.2) ("Personal Property").

**1.2** All inventory (as defined in the UCC), including, without limitation, the items listed on Schedule 1.3 ("Inventory").

**1.3** All accounts, chattel paper, documents, and instruments (all as defined in the UCC), including all accrued interest receivable and also any security Seller hold for the payment thereof (including, without limitation, the items described on Schedule 1.4) ("Receivables") and all of Seller's general intangibles (as defined in the UCC) and, to the extent not otherwise constituting general intangibles as defined above, any interest of Seller in any and all claims by Seller against any other person or entity, whether now accrued or later to accrue, contingent or otherwise, known or unknown, including, but not limited to, all rights under express or implied warranties from suppliers (except as they may pertain to Seller's liabilities other than Assumed Liabilities), claims for collection or indemnity, claims in bankruptcy, and choses in action.

**1.4** All of the cash, cash equivalents, and amounts held on deposit in all savings, checking, money market, investment, and other similar accounts, and at the Premises.

**1.5** All Seller's right, title, benefit, and interest in and to all intellectual property and intellectual property rights owned by or licensed by the Seller, including, but not limited to all inventions, discoveries, improvements, designs, prototypes, trade secrets, manufacturing and engineering drawings, process sheets, specifications, bills of material, patents, patent applications, registered and unregistered copyrights and copyright rights in both published and unpublished works, registered and unregistered trademarks, registered and unregistered trade names, formulae and secret and confidential processes, know-how, technology, customer lists, computer software, databases, data, process technology, and other industrial property (whether patentable or unpatentable), all rights to sue for the infringement of any of the foregoing, all renewals and extensions of any of the foregoing, and all goodwill of Seller relating to any of the foregoing ("Intellectual Property") to the extent not otherwise included in this Section 1.

**1.6** The full benefit of (a) any and all purchase orders placed with and accepted by Seller in the ordinary course of business on or before the Closing Date that have not been completely performed or filled before the Closing Date, covering the purchase from Seller of products to be supplied by Seller, or covering the rendition by Seller of services, and including all deposits, progress payments, and credits; (b) purchase orders placed by Seller before the Closing Date that have not been completely performed before the Closing Date, covering Seller's purchase

of inventory, supplies, or materials in the ordinary course of business; (c) leases of personal property and other agreements; and (d) all policies of insurance and rights to make claims and other rights under the policies ("Contracts and Commitments").

**1.7** All records and lists that pertain directly or indirectly, in whole or in part, to any one or more of the following: Seller's suppliers, advertising, promotional material, sales, services, delivery, internal organization, employees, and/or operations.

**1.8** All security deposits, prepaid expenses, and similar items accrued as of the Closing Date.

**1.9** All transferable local, state, and federal franchises, licenses, bonds, permits, and similar items pertaining to the Business and/or the Purchased Assets ("Permits").

**1.10** The Business conducted by Seller as a going concern, including any and all goodwill, telephone and facsimile numbers, advertisements, websites, and Seller's right to use the name Comfort Inn and all related names and derivations, and the entire right, title, and interest in the United States and throughout the world including any and all Internet domain names ("Domain Name") registered by Seller.

**1.11** All leasehold interests of Seller, including as to the real property lease with St. Marie Hospitality.

**2.** **Liabilities Assumed.** Seller agree that Buyer assumes no liabilities of Seller, whether accrued, absolute, contingent, matured, not matured, known, unknown, or otherwise, *except* only for (a) the claims scheduled or filed in the United States Bankruptcy Court, Eastern District of Michigan Case No. 21-45708-mlo (ED Mich) that are specifically identified on Schedule 2; (b)    (the "Assumed Liabilities").

**3.** **Purchase Price for Purchased Assets.**

**3.1** **The Purchase Price.**
    a.    The purchase price to be paid by Buyer to Seller for the Purchased Assets ("Purchase Price") of Soo Hotels, Inc. is as follows:
        1.    $300,000.00 cash at Closing;
        2.    The Assumed Liabilities of Soo Hotels, Inc. detailed in Schedule 2 totaling $583,959.65, of which $242,627.34 shall be paid at closing and may be paid from the Purchased Assets and of which the $341,332.31 claim of Choice Hotels shall be assumed; and

3. Buyer shall be responsible to pay the allowed administrative expenses out of the remaining cash balance of the Debtor's estate   .
4. For purposes of clarification, the parties are not waiving their ability to file objections to any filed claims.

The total Purchase Price as detailed above represents payment to the Bankruptcy Estate, from which Salwan Atto shall receive net proceeds of the $300,000.00 cash payment after payment of allowed non-insider unsecured claims and is contingent on Salwan Atto surrendering his stock and releasing all claims that he or any related persons have, whether known or unknown. Dominic Shammami will waive any distribution of the Purchase Price in consideration for the Trustee's potential claims against him, whether known  or unknown, which are being settled in full pursuant to this Agreement.

The total purchase price for Soo Hotels, Inc. is $883,959.65 plus assumption of the allowed administrative expenses .

**3.2 Higher offers.** In accordance with applicable Bankruptcy Code provisions, Seller is authorized to solicit higher offers and undertake a court approved bidding procedure subject to the following terms and conditions.

a. Higher bids shall be calculated over the total purchase price of $883,959.65, however, a qualified bidder may also assume the liability of Choice Hotels in the amount of $341,332.31, and pay the allowed administrative expenses so that when computing competing offers the overbids must be above the $542,627.34 amount [$242,627.34 prepetition liabilities being paid plus $300,000 distribution to equity] so long as the Choice Hotels claim is being assumed and the qualified bidder is paying the allowed administrative expenses.
b. In the event that a third-party bidder outbids Buyer, Buyer and Shareholder Salwan Atto shall split and each receive 50 percent of the total net cash proceeds allocated to Soo Hotels, Inc. over and above what is required to pay the Assumed Liabilities and the allowed administrative expenses.
c. In the event that Salwan Atto or Shawn Atto secure the winning bid, Dominic Shammami shall receive $300,000 plus the additional overbid amount allocated to Soo Hotels, Inc. after payment of       all allowed non-insider unsecured claims per the subsection above, and Salwan Atto shall not receive any distribution.
d. All allocations described in this section are contingent on the parties who are to receive cash proceeds surrendering their stock and

releasing all claims that they or any related persons have, whether known or unknown.

    **3.3**   **Payment of Purchase Price.** Buyer shall pay the Purchase Price on the Closing Date as follows:

        a.   At the time of signing this agreement, Buyer shall deposit in escrow a portion of the Purchase Price equal to $50,000 payable to the Trustee in Possession who shall hold such purchase amount in trust until closing. Such amount shall be refunded to Buyer should Buyer not become the prevailing bidder at closing.

        b.   At closing should Buyer become the highest bidder, Buyer shall deliver to Seller a cashier's or certified check payable to Seller in the amounts listed in Section 3.1 above less credit for the $50,000 escrow deposit.

        c.   The Trustee shall hold back $15 0,000 in escrow from the balance of cash on hand to secure Buyer's or the prevailing bidder's payment of allowed administrative expenses of Soo Hotels, Inc. An amount remaining after payment of allowed administrative expenses shall be remitted to the Buyer or prevailing bidder within a reasonable amount of time after court approval of administrative expenses.

    **3.4**   **Allocation of Purchase Price.** The Purchase Price shall be allocated among the Purchased Assets in accordance with the principles of IRC 1060 as set forth on attached Schedule 3.3. Buyer and Seller agree to execute and deliver at the Closing duplicate IRS Forms 8594, with an allocation of the Purchase Price in accordance with this Section 3.3 and otherwise acceptable to Buyer. Buyer and Seller further agree to file all other returns and reports in a manner consistent with the allocations in this Section and no party shall take a position in any administrative or judicial proceeding that is inconsistent with this Section unless required to do so by law.

    **4.**   **Related Agreements.** All other agreements and instruments that are to be executed and delivered by a party in connection with the Closing are sometimes referred to herein as the "Related Agreements."

    **5.**   **Encumbrances.** Seller shall deliver good title to the Purchased Assets free and clear from all mortgages, liens, claims, demands, charges, options, equity interests, leases, tenancies, easements, pledges, security interests, interests except for the Assumed Liabilities, and other encumbrances ("Encumbrances") pursuant to a final Order of the Bankruptcy Court which provides that the Buyer is a good faith purchaser. Buyer shall take the assets subject to the Assumed Liabilities.

6. **Preclosing Actions.** Before the Closing:

6.1 **Conduct of Business.** Seller shall carry on and conduct the Business only in the ordinary course consistent with past practices, without any change in the policies, practices, and methods that Seller pursued before the date of this Agreement. Seller will use its best efforts to preserve the Business organization intact; to preserve the relationships with Seller's customers, suppliers, and others having business dealings with it; and to preserve the services of Seller's employees, agents, and representatives.

6.2 **Buyer's Access.** From the date of this Agreement through the Closing, Seller shall permit Buyer and its representatives to make a full business, financial, accounting, and legal investigation of Seller, the Business, the Purchased Assets, and the Assumed Liabilities.

7. **Obligations.** The parties' obligations to consummate the transactions contemplated by this Agreement are subject to the following conditions:

   a. Buyer shall assume the Choice Hotels International, Inc. Franchise Agreement or receive approval from Choice Hotels International for a new Franchise Agreement and shall assume the real estate lease with St. Marie Hospitality which is attached ("Real Estate Lease"); and,

   b. Buyer shall receive authorization in the United States Bankruptcy Court, Eastern District of Michigan Case No. 21-45708-mlo pursuant to a final Order authorizing the sale free and clear of liens, claims, encumbrances and interests and assuming the Choice Hotels Franchise Agreement or receipt of a new Choice Hotels Franchise Agreement and assuming the Real Estate Lease in a form acceptable to Buyer.

   c. **Accuracy of Representations and Warranties.** As is where is.

7.1 **Performance of Covenants.** The Seller shall have in all respects performed and complied with all covenants, agreements, and conditions that this Agreement and all related documents require to be performed or complied with before or at the Closing.

7.2 **Permits.** Buyer shall have received all permits that in Buyer's opinion are necessary to operate the Business after the Closing.

7.3 **No Casualty.** Before the Closing Date, Seller shall not have incurred, or be threatened with, a material liability or casualty that would materially impair the value of the Purchased Assets or the Business.

7.4  **Instruments of Transfer.** Seller shall have delivered to Buyer all bills of sale, instruments of transfer, conveyances, assurances, assignments, approvals, consents, and any other instruments and documents containing the usual and customary covenants and warranties of title that are consistent with the requirements of Section 5 and the warranties Seller make in this Agreement and that shall be necessary or reasonably required to effectively transfer the Purchased Assets to Buyer with good title, free from all Encumbrances.

7.5  **No Litigation.** No proceeding or investigation shall have been instituted before or by any court or governmental body (a) to restrain or prevent the carrying out of the transactions contemplated by this Agreement, or (b) that might affect Buyer's right to own, operate, and control the Purchased Assets after the Closing Date.

7.6  **Lien Search.** Buyer shall have received UCC lien searches in form and content satisfactory to Buyer.

7.7  **Consents.** Seller shall have obtained, in writing, all consents necessary or desirable to consummate or to facilitate consummation of this Agreement and any related transactions. The consents shall be delivered to Buyer before Closing and shall be reasonably acceptable to Buyer in form and substance.

7.8  **Conditional Tax Clearance.** Seller shall have provided to Buyer a certificate of conditional tax clearance from the Revenue Commissioner of the State of Michigan showing that Seller has filed all tax returns and reports required to be filed before Closing and that it has paid all taxes due pursuant to Section 27a of Act No. 58 of the Michigan Public Acts of 1986, MCL 205.27a.

7.9  **Unemployment Insurance Contribution Liability.** Seller shall have provided to Buyer a statement from the Commissioner of the Michigan Unemployment Insurance Agency certifying the status of Seller's contribution liability under Section 15(g) of the Michigan Employment Security Act, MCL 421.15(g).

7.10  **Name Change Documents.** Seller shall have taken all required actions to change its name as contemplated in Section 17 and shall have delivered to Buyer a certified copy of the filed certificate of amendment to Seller's Articles of Incorporation changing its name.

7.11  **Other Documents and Instruments.** Buyer shall have received all other documents and instruments as it has reasonably requested.

7.12  **Approvals by Buyer's Counsel.** Buyer's counsel shall have reasonably

approved all legal matters and the form and substance of all documents that Buyer or Seller is to deliver at the Closing.

8. **Conditions Precedent to Seller's Obligations.** Seller's obligations to consummate the transactions contemplated by this Agreement are subject to the fulfillment (or waiver by them) of each of the following conditions before or at the Closing:

8.1 **Accuracy of Representations and Warranties.** Buyer's representations and warranties contained in this Agreement and all related documents shall be true and correct as of the date of this Agreement and at and as of the Closing.

8.2 **Performance of Covenants.** Buyer shall have in all respects performed and complied with all the covenants, agreements, and conditions that this Agreement and all related documents require to be performed or complied with before or at the Closing

9. **Closing Matters.**

9.1 **Closing.** The closing of the transactions contemplated in this Agreement (the Closing) shall take place at a date and time following an auction date at a location to be provided by the Trustee in Possession in the Soo Hotels, Inc. matter (the Closing Date). All transactions and all documents executed and delivered at the Closing shall be deemed to have occurred simultaneously, and no transaction shall be deemed to have occurred and no document shall be deemed to have been executed or delivered unless all transactions have occurred and all documents have been executed and delivered. For the purposes of this Agreement, the term *Business Day* means a day other than a Saturday or Sunday on which banks are generally open for business in Michigan.

9.2 **Certain Closing Expenses; Prorations.** Seller shall be liable for and shall pay all federal, state, and local sales, use, excise, and documentary stamp taxes and all other taxes, duties, or other like charges properly payable on and in connection with Seller's conveyance and transfer of the Purchased Assets to Buyer. Utility charges (including electricity, gas, water, sewer, and telephone), refuse collection, and other service contracts assumed by Buyer shall be prorated ratably as of the Closing Date. To the extent practicable, all prorations shall be computed and paid at the Closing, and to the extent not practicable, as soon as practicable thereafter.

9.3 **Further Assurances.** Seller shall cooperate with and assist Buyer with the transfer of the Purchased Assets under this Agreement and take all

other reasonable actions to assure that the business is smoothly transferred to Buyer. From time to time after the Closing Date, Seller shall, at the request of Buyer, execute and deliver all additional conveyances, transfers, documents, instruments, assignments, applications, certifications, papers, and other assurances that Buyer requests as necessary or desirable to effectively carry out the intent of this Agreement and to transfer the Purchased Assets to Buyer.

10. **Seller's Representations and Warranties.** This sale is an as is where is sale subject only to bankruptcy court approval and acceptance by Choice Hotels, Inc. of buyer as franchisee **or assumption and assignment of their franchise agreement and** to assumption and assignment of the real estate lease with St. Marie Hospitality, Inc.

11.

11.1 **Compliance with Laws.** At all times before the Closing Date, Seller has complied with all laws, orders, regulations, rules, decrees, and ordinances affecting to any extent or in any manner any aspects of the Business or the Purchased Assets.

11.2 **No Brokers.** Seller has not engaged, and is not responsible for any payment to, any finder, broker, or consultant in connection with the transactions contemplated by this Agreement.

11.3 **Bank Accounts.** Attached Schedule 1.4 contains a true and complete list of the names and locations of all banks or other financial institutions that are depositories of funds of Seller , the names of all persons authorized to draw or sign checks or drafts on the accounts, the numbers of the accounts, and the names and locations of any institutions in which Seller has safe- deposit boxes and the names of the individuals having access to those boxes.

11.4 **Insurance.** Insurance policies covering Seller's real and personal property or providing for business interruption, personal and product liability coverage, and other insurance shall be transferred to Buyer at Buyer's sole discretion (which specifies the insurer, policy number, type of insurance, and any pending claims). The insurance is in amounts Seller deems sufficient with respect to its assets, properties, business, operations, products, and services as they are presently owned or conducted, and all of the policies are in full force and effect and the premiums have been paid. There are no claims, actions, suits, or proceedings arising out of or based on any of these insurance policies, and no basis for any claim, action, suit, or proceeding exists. Seller is not in default with respect to any provisions contained in any insurance policies and has not failed to give any notice or present any claim under any insurance policy in due and timely fashion.

12. **Buyer's Representations and Warranties.** Buyer represents and warrants to Seller that as of the date of this Agreement and as of the Closing Date:

12.1 **Organization and Standing.** Buyer is purchasing on behalf of an entity that has been formed or is to be formed.

12.2 **Authorization.** Buyer has taken all necessary action (a) to approve the execution, delivery, and performance of this Agreement and each of the Related Agreements to which it is to be a party and (b) to consummate any related transactions contemplated by these agreements. Buyer has duly executed and delivered this Agreement. This Agreement is, and, when executed and delivered by the parties, each of the Related Agreements to which Buyer will be a party will be, the legal, valid, and binding obligations of Buyer, enforceable against Buyer in accordance with their respective terms, except enforcement may be limited by bankruptcy, insolvency, moratorium, or similar laws relating to the enforcement of creditors' rights and by general principles of equity (regardless of whether enforceability is considered in a proceeding at law or in equity).

13. **Post-Closing Receipts.** After the Closing, Seller will immediately notify and transfer to Buyer any payments or other receipts it receives with respect to any of the Purchased Assets. Pending their transfer, Seller will segregate any payments from its other assets and will clearly mark or designate them as the property of Buyer.

14. **Expenses.** Each of the parties shall pay all of the costs that it incurs incident to the preparation, execution, and delivery of this Agreement and the performance of any related obligations, whether or not the transactions contemplated by this Agreement shall be consummated.

15. **Risk of Loss.** The risk of loss of or damage to the Purchased Assets from fire or other casualty or cause shall be on Seller at all times up to the Closing, and it shall be the responsibility of Seller to repair, or cause to be repaired, and to restore the property to the condition it was in before the loss or damage.

16. **Seller's Name.** Seller agree that from and after the Closing Date, Buyer shall have the right to use in or in connection with the conduct of any business (whether carried on by it directly or through any related corporation) the name Comfort Inn ("Name"); any part or portion of the Name, either alone or in combination with one or more other words; or any variation of the Name. Seller warrant to Buyer that it has taken all necessary action to protect the Name in the State of Michigan and agrees to take or cause to be taken any and all steps or actions that shall be or

become permissible, proper, or convenient to enable or permit Buyer to use the Name, or any part or portion of the Name, either alone or in combination with one or more other words. It is contemplated that Seller will change its name to _____. After the Closing Date, Seller agree that it will not use either directly or indirectly the Name or the initials, or any of them, either alone or in combination with one or more other words, in or in connection with any business, activities, or operations that Seller directly or indirectly carries on or conducts.

**17. Termination.**

**17.1** This Agreement may be terminated at any time before the Closing Date as follows:

(a) By Buyer and Seller in a written instrument.

(b) By either Buyer or Seller if the Closing does not occur on the Closing Date.

(c) By Buyer or Seller if there has been a material breach of any of the representations or warranties set forth in this Agreement on the part of the other, and this breach by its nature cannot be cured before the Closing.

(d) By Buyer or Seller if there has been a breach of any of the covenants or agreements set forth in this Agreement on the part of the other, and this breach is not cured within 10 Business Days after the breaching party or parties receive written notice of the breach from the other party.

**17.2** If terminated as provided in Section 16.1, this Agreement shall forthwith become void and have no effect, except for Sections 16.3 and 17, and except that no party shall be relieved or released from any liabilities or damages arising out of the party's breach of any provision of this Agreement.

**18. Miscellaneous Provisions.**

**18.1 Representations and Warranties.** All representations, warranties, and agreements made by the parties pursuant to this Agreement shall survive the consummation of the transactions contemplated by this Agreement, without limitation as to time. Seller has made no representations or warranties and this sale is an as is where is sale subject only to bankruptcy court approval and acceptance of the franchisee by Choice Hotels, Inc. or assumption and assignment of their franchise agreement

and also as to assumption and assignment of the real property lease with St. Marie Hospitality, Inc.

**18.2** **Notices.** All notices, demands, and requests required or permitted to be given under the provisions of this Agreement shall be in writing and shall be deemed given (a) when personally delivered or sent by electronic or facsimile transmission to the party to be given the notice or other communication or (b) on the business day following the day the notice or other communication is sent by overnight courier to the following:

if to Seller :
    Soo Hotels, Inc.
    c/o Dominic Shammami
    4884 Quarton Road
    Bloomfield Hills, Michigan 48302
    dshammami@comcast.net

with a copy to
    Kimberly R. Clayson
    JAFFE RAITT HEUER
    & WEISS, P.C.
    27777 Franklin Rd.,
    Suite 2500
    Southfield, MI 48034
    kclayson@jaffelaw.com
    248.727.1635

if to Buyer:
    Dominic Shammami on behalf of an entity    to be formed
    4884 Quarton Road
    Bloomfield Hills, Michigan 48302
    dshammami@comcast.net

or to another address or email address that the parties may designate in writing.

**18.3** **Assignment.** Neither the Seller nor Buyer shall assign this Agreement, or any interest in it, without the prior written consent of the other, except that Buyer may assign any or all of its rights under this Agreement to any subsidiary without Seller's consent.

**18.4** **Parties in Interest.** This Agreement shall inure to the benefit of, and be binding on, the named parties and their respective successors and permitted assigns, but not any other person or entity. No person or entity other than the parties and the respective successors and permitted

assigns shall have any rights or remedies under this Agreement.

**18.5** **Choice of Law.** This Agreement shall be governed, construed, and enforced in accordance with the laws of the State of Michigan.

**18.6** **Counterparts.** This Agreement may be signed in any number of counterparts with the same effect as if the signature on each counterpart were on the same instrument.

**18.7** **Entire Agreement.** This Agreement and all related documents, schedules, exhibits, or certificates represent the entire understanding and agreement between the parties regarding the subject matter and supersede all prior agreements, representations, warranties, and negotiations between the parties. This Agreement may be amended, supplemented, or changed only by an agreement in writing that makes specific reference to this Agreement or the agreement delivered pursuant to it and that is signed by the party against whom enforcement of the amendment, supplement, or modification is sought.

**18.8** **Severability.** Whenever possible, each provision of this Agreement shall be interpreted in a manner to be effective and valid under applicable law, but if one or more of the provisions of this Agreement is subsequently declared invalid or unenforceable, the invalidity or unenforceability shall not in any way affect the validity or enforceability of the remaining provisions of this Agreement. In the event of a declaration of invalidity or unenforceability, this Agreement, as so modified, shall be applied and construed to reflect substantially the intent of the parties and achieve the same economic effect as originally intended by its terms. In the event that the scope of any provision to this Agreement is deemed unenforceable by a court of competent jurisdiction, or by an arbitrator, the parties agree to the reduction of the scope of the provision as the court or arbitrator shall deem reasonably necessary to make the provision enforceable under the circumstances.

The parties have executed this Agreement on the date set forth on the first page of this Agreement.

**SELLER**
SUBJECT TO BANKRUPTCY COURT APPROVAL
SOO HOTELS, INC.

*Kimberly Ross Clayson*
By: Kimberly Clayson
Its: Chapter 11 Subchapter V
Bankruptcy Trustee

Dated: March 18, 2022

**BUYER**

By: Dominic Shammami on behalf of an entity to be formed

Dated: March 18, 2022

**Schedule 1.2 Personal Property**

**Schedule 1.3 Inventory**

**Schedule 1.4 Receivables**

4867-6560-9237.v1

**Schedule 2 Liabilities Assumed or to be Paid at Closing**

Liabilities of Soo Hotels, Inc.:
1. $14,779.69 owed to the Internal Revenue Service
2. $153,467.46 owed to the U.S. Small Business Administration
3. $29,900.00 owed to Namou Hospitality
4. $9,000.00 owed to City of Sault Ste. Marie
5. $561.08 owed to American Hotel Register
6. $8,497.25 owed to Cloverland Coop
7. $1,940.35 owed to CSI Group International
8. $2,251.00 owed to ECOLAB
9. $981.60 owed to Golden Malted
10. $674.33 owed to Great Lake Services
11. $1,049.22 owed to Greentech
12. $4,166.56 owed to Guest Supply
13. $400.00 owed to Matheny Lawn Service
14. $2,100.00 owed to Spectrum Enterprise
15. $381.07 owed to Ultra Chem Inc.
16. $552.13 owed to Waste Management
17. $856.95 owed to Unemployment Insurance Agency for period ending June 2021
18. $11,068.65 owed to Michigan Sales, Use and Withholding for the period ending June 2021.

The parties are not stipulating that these amounts are properly owing, and may file objections to claim or settle the amounts that are being claimed.

**Schedule 3.3 Allocation of Purchase Price**

4867-6560-9237.v1

**Real Estate Lease with St. Marie Hospitality**

4867-6560-9237.v1